OPINION
{¶ 1} Defendant-appellant, Richard Haag, appeals his conviction on one count of receiving stolen property following a jury trial in the Butler County Court of Common Pleas. We affirm appellant's conviction.
 {¶ 2} In July 2000, Floyd Rockwell bought a flatbed tilt trailer from Tegtmeyer's Trailer Sales, Inc. in Wilmington, Ohio for $2,754.94. The trailer had been manufactured by Neal Manufacturing, Inc.; it bore a number consisting of a letter and the last three digits of the trailer's serial number on the inside of the trailer's tongue, as well as a decal on the outside of the tongue. Rockwell registered the trailer with the Ohio Bureau of Motor Vehicles ("BMV") a few days after he bought it, using the 2,500 pound shipping weight listed on Neal's statement of origin.
 {¶ 3} Rockwell made several modifications to the trailer. He installed two yellow lights on a plate on the front of the fenders at a 45 degree angle, and two red lights on a similar plate on the back of the fenders at a 45 degree angle. To install the lights, Rockwell drilled two holes in the metal and used self-tapping screws and never seize compound, a silver substance. Because never seize compound never dries, it keeps bolts and nuts from seizing up and rusting. Rockwell also installed reflective tape directly above the yellow and red lights, replaced the trailer's six-way plug with a seven-way plug, and relocated the license plate lights and bracket from the back of the flatbed to the back of the left fender. Rockwell used the reflective tape leftover on his mailbox.
 {¶ 4} On June 8, 2001, Rockwell discovered that his trailer was missing from his property. Several days later, Rockwell observed a trailer attached to appellant's pickup truck driving up the road. The trailer, which had an unusual dovetail on the back, looked identical to the one that had been stolen. While following appellant, Rockwell recognized the lights he had installed on the fenders, and the location of the license plate. Rockwell pulled appellant over. When asked where he had gotten the trailer, appellant replied he had bought it. Rockwell told appellant that it was his trailer and that it had been stolen. Appellant gave him his name and 4666 Hamilton Eaton Road as his home address. Appellant then drove away and Rockwell reported the incident to the police. The address given by appellant was a fake address. Rockwell, however, eventually located appellant's house at 6440 Hamilton Eaton Road.
 {¶ 5} Deputy Thomas Lantz, from the Butler County Sheriff's Office, assisted in the investigation. The officer met appellant on July 11, 2001. Appellant adamantly told the officer that the trailer was his and that he had built it. The officer asked to see the trailer and took several pictures of it. When asked if he had used any special lubricants for the lights, appellant replied he had not. Running his finger underneath the light bolts, the officer discovered the never seize compound. Although claiming he had built the entire trailer himself, appellant had no explanation regarding the compound.
 {¶ 6} Rockwell was then asked to come to appellant's property to look at the trailer. While there, Rockwell pointed out the modifications he had made to the trailer, as well as the changes that had been made to the trailer after the theft, to wit: the paint inside the tongue had been removed; the identification number inside the tongue had been ground down and welded over with the letters H A A G; the Neal decal outside the tongue had been removed and painted over; the seven-way plug put on by Rockwell had been replaced by a six-way plug; the black and new jack had been replaced by a red and somewhat worn jack; and the wheels had been replaced.
 {¶ 7} On July 12, 2001, as part of his investigation, Deputy Lantz located another Neal trailer in Wilmington. It had a partial identification number on the inside of the tongue as well as a Neal decal on the outside of the tongue. The officer compared the Neal trailer with the trailer on appellant's property. The two trailers had identical frame construction and similar decals, pin striping, and flares. The officer also compared the disputed trailer with a trailer appellant had built and sold to Denny Kuykendall. The two trailers did not look alike as one looked like it was home built, while the other did not.
 {¶ 8} Appellant was arrested on July 18, 2001 and charged with one count of receiving stolen property. That same day, the sheriff's office took possession of the disputed trailer. It was then noticed that the reflective tape had been replaced. While the tape on the trailer on July 11, 2001 was dirty and matched the tape on Rockwell's mailbox, the tape on the trailer on July 18, 2001 had a different pattern and was clean and brand new.
 {¶ 9} On April 11, 2002, a jury found appellant guilty of receiving stolen property, a first-degree misdemeanor, in violation of R.C. 2913.51(A). Appellant was subsequently sentenced of record. This appeal follows.
 {¶ 10} In his sole assignment of error, appellant argues that the evidence introduced at trial was insufficient to convict him and that his conviction was against the manifest weight of the evidence. At the heart of both arguments is appellant's claim that the state failed to show beyond a reasonable doubt that the trailer recovered from appellant's property was Rockwell's trailer and not appellant's.
 {¶ 11} When reviewing the sufficiency of evidence to support a criminal conviction, "[a]n appellate court's function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 12} In order for an appellate court to reverse a trial court's judgment on the basis that the verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact-finder's resolution of any conflicting testimony. State v.Thompkins, 78 Ohio St.3d 380, 389, 1997-Ohio-52. Specifically, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 13} Appellant was convicted of receiving stolen property in violation of R.C. 2913.51(A), which provides that "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Rockwell testified he never gave anyone permission to use his trailer. The issue on appeal is whether at trial the state established beyond a reasonable doubt that the disputed trailer recovered on appellant's property was in fact Rockwell's.
 {¶ 14} Appellant testified that he builds custom trailers, that he owns all of the tools, equipment, and materials necessary to build a trailer like the one at issue, and that he has built several trailers in his life. Appellant testified that he had built the disputed trailer from scratch and that he was working on it in May 2001, that is, prior to the time Rockwell's trailer was stolen. Darrell Colwell testified that in May 2001, he and appellant used a trailer appellant had just built to haul shingles. The trailer was a flatbed tilt trailer. Similarly, Denny Kuykendall and Roland Robinson testified that they had seen appellant work on a trailer in May 2001. Specifically, Robinson testified seeing appellant grinding down the metal, getting it ready to be welded together. Robinson also testified that during the same period of time, there were three other similar flatbed trailers on appellant's property.
 {¶ 15} To support his claim he had built the disputed trailer from scratch, appellant submitted various receipts for parts and the like. However, appellant admitted on cross-examination that the receipts were not necessarily for that trailer. Appellant also testified that this was the first trailer he had built with a tilt bed. Appellant testified he did not use a pattern to build it; rather, the design came out "of [his] head." Appellant further testified that he had never owned a Neal trailer and that he had never heard of the manufacturer. Yet, the trailer recovered from his property and a trailer manufactured by Neal and located in Wilmington by Deputy Lantz had identical frame construction, similar flares, and very similar, if not identical, pin striping. In addition, unlike the pin striping on the trailer recovered from his property and allegedly built by appellant, the pin striping on the trailer he had built and sold to Kuykendall was wavy and looked homemade.
 {¶ 16} Tim Taylor, who used to build trailers, was asked to compare the disputed trailer with a trailer built by appellant. Taylor testified that both trailers were designed and constructed similarly, and were almost identical. Yet, there were inconsistencies between the two of them: the wiring was completely different and the weld patterns were different. Taylor testified that the disputed trailer looked more like it had "been put in a jig and was a factory built trailer[.]" Taylor testified noticing a name welded inside the tongue of the trailer. Taylor testified he did not see any evidence of grinding on the trailer but stated that he was only comparing structures and therefore was not looking for that kind of evidence. Taylor also testified that scratched metal will leave scars and thus show through paint "unless you're a real good grinder and dress it up, and primer it, and built it back up." Kuykendall testified appellant was a good welder while Colwell testified appellant was good at what he does.
 {¶ 17} As previously noted, Rockwell had made several very specific modifications to the trailer he had bought. The trailer recovered from appellant's property bore some of the exact same characteristics, to wit, the sets of yellow and red lights on the fenders, the use of reflective tape, and the location of the license plate. To install the lights, Rockwell had purposely used never seize compound. During his first encounter with appellant, Deputy Lantz specifically asked him if he has used any special lubricants for the lights. Appellant replied he had not. Yet, the trailer appellant had allegedly built from scratch had such compound. Appellant had no explanation for its presence. By contrast, at trial, appellant claimed using never seize compound to install the lights on the disputed trailer.
 {¶ 18} Rockwell had also put reflective tape on his trailer and used the leftover on his mailbox. The sheriff's office took pictures of the disputed trailer on July 11, 2001. The trailer remained in appellant's possession (except for a couple of days when it was allegedly used by appellant's nephew) until July 18, 2001 when the sheriff's office took possession of it. It was then noticed that the reflective tape had been replaced. While the tape on the trailer on July 11, 2001 was dirty and matched the tape on Rockwell's mailbox, the tape on the trailer on July 18, 2001 had a different pattern and was clean and brand new. Appellant denied replacing the tape.
 {¶ 19} At trial, appellant asserted that the trailer recovered from his property could not be Rockwell's as their weight was significantly different. When registering his trailer with the BMV, Rockwell used the 2,500 pound shipping weight listed on Neal's statement of origin. Appellant testified that the disputed trailer only weighed 1,840 pounds. However, official weight slips for the disputed trailer submitted by the state showed variable weights ranging from 1,940 to 2,220 pounds between January 22 and February 23, 2002. Indeed, the disputed trailer weighed 1,940 pounds on February 21, 2002 but 2,220 pounds two days later.
 {¶ 20} Upon looking at the disputed trailer on appellant's property on July 11, 2001, Rockwell recognized some of the modifications he had made to the trailer (lights, reflective tape, and location of the license plate). He also pointed out the changes that had been made to the trailer following the theft, to wit, the paint inside the tongue had been removed; the identification number inside the tongue had been ground down and welded over with the letters H A A G; the Neal decal outside the tongue had been removed and painted over; the seven-way plug Rockwell installed had been replaced by a six-way plug; the black and new jack had been replaced by a red and somewhat worn jack; and the wheels had been replaced.
 {¶ 21} In light of all of the foregoing and based upon the evidence at trial, we find that the jury could infer that the disputed trailer recovered from appellant's property had not been built by appellant but was in fact Rockwell's trailer. In accordance with the standards of review articulated above, we find that appellant's conviction on one count of receiving stolen property was supported by sufficient evidence and was not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled.
Judgment affirmed.
VALEN, P.J., and WALSH, J., concur.